You may proceed. Good morning, your honors. I'm Thomas Burke from Los Angeles. I represent the appellants and plaintiffs Lou Hernandez and Cindy and Cindy Calderon. We believe the court made a grievous error in finding that there was no causal link between the speech involved here and the retaliatory actions. And we also believe that I want to thank this panel. It's wonderful to be in this city in a great courtroom and this panel is one each of you has written wonderful decisions on police retaliation. For example, in 2000 Blair v. City of Pomona, authored by Judge Noonan, was an extreme example of how retaliation can take the form from anonymous sources where you don't even know who's doing it. But there was a campaign for nine or ten months after someone witnessed time card fraud and other things going on in his unit and he was retaliated against and there was no pinpointing who did what to him. He, you know, the retaliation to him was anonymous, you might say, and he was forced out of the department. He couldn't handle it. Well, you know, we all get have the advantage of writing being involved in other interesting cases and whatnot. And I appreciate that, appreciate your general assessment. But I'm really concerned at the moment with why the district court here made an error of law that would require reversal. Well, I think there's basically three reasons. So, you know, the time period here is significant, right? Yes. So there were some key events that happened right after the initial sort of disclosures or whatever, the raising the issue about time card fraud. Yes, but the free speech. And so there were some pretty clear-cut, what looked like adverse actions, right? Right afterwards. Right afterwards. But no lawsuit is filed. No lawsuit was filed then. So you got problems with the statute of limitations on those discreet acts. And so now you're down outside, you know, when you get to the you have to look what's in the two-year statute of limitations period. And when you get there, you know, you lose the benefit of the temporal proximity. There's no white, there's no clear line drawing, but, you know, you're on the way, way, way on the outer end at two years out. So really what you got to show, one, is either that there was some overt, you know, overt statements by the officials, you know, criticizing the defendants, or the, you know, the circumstantial evidence, sort of the third part of that test. Your Honor, and one of the decisions you were involved in, Imeldi, talked about the importance of circumstantial evidence, especially in summary judgment. And here, the error of the city, and I think an error that they'd like you to fall into, is to think that the speech here all happened in 2007. What our man said was that he was speaking about this to anyone that would listen, inside the department, outside the department. He didn't say it ended in 2007. And there's evidence it was still going on in 2010, because in January 2000 We get called in by what was the fellow's name? Elkintar. Captain Elkintar, someone two levels above him, okay, saying, I'm ordering you not to talk about Zerati to anyone inside the department, outside the department. There was nothing, I couldn't see anything in the record that showed what was going on within the department, or the city attorney's office, or the DA's office, or what regarding any ongoing investigation of the original allegations of time fraud. There is evidence in the newspaper accounts, Your Honor, about how he was charged But there was an audit that went on until 2012, criticizing the department for its lax overtime policies. And that's in the record? Yes. And were any of the officials that were sort of named throughout this, that are in the record, that appear sort of connected? They were not named. Were they involved at all in that sort of investigation? Were they called in and, you know, interrogated and? We don't have evidence of that, and that evidence is not in the record, Your Honor. I just know that our allegation, in part from the deposition of Mr. Hernandez, which has been thrown into the record by the city, there's 20 or 30 pages of his deposition where he says there was a whitewash investigation of Zerati because he wasn't even interviewed, not once. And everyone in the department knew of him as someone that was pointed out as someone talking about Zerati and having a problem with Alcantara. There was a standing joke he testified to. People would walk up to him and say, hi, Lou, I want to shake your hand, because he had told the captain he didn't want to shake his hand or acknowledge him in the morning. So for years thereafter, he was the snitch in the department that supposedly had gotten Zerati, who was a popular guy, because he was giving out benefits to anyone that wanted them. So let me ask you, so you point to, I guess they applied for, both of them applied for positions in the gang unit. Yes. And then in the family violence, the domestic violence unit. Yes. And neither one of them, as they went through that process, neither one of them. Made it. Right. They were, the family, I think the family, the domestic violence unit applications came later, shortly later. But you claim that those were adverse actions. Yes. And that the reason they give that they just didn't meet the, you know, they just didn't cut it, were false. Yes. The real reason was retaliation. Yes. But none, but were any of the decision makers on those panels at all involved in the time card fraud situation? Well, or were they connected to, you know, the other people? They were connected because they were friends of Sergeant Zarate. And this is again, where we thank the city for putting so much of the deposition testimony into the record. Sergeant Zarate's friends were Sergeant Spicer, who headed the gang unit and Sergeant Spicer, when Alcantara retired, just before the application into the gang units, he spoke at the retirement in very glowing terms about his friend, Alcantara. And one other thing in the record, Your Honor, that the city put in is the evaluation of Lou Hernandez when he left the airport. So let me ask you, so I understand this case to be one of those cat's paw theory cases, who is the cat and who are the paws that got his. Well, the cat, the paws. I think what happens is that the cat is a motivating factor. It's Alcantara and Zarate. These are the people that wanted to keep their system going of bribery in the department, okay? And one of the important things about this is the city of San Jose, like most police departments, is very hierarchical. As you mentioned, I think in Dahlia, police departments are hierarchical. They don't like dissent. And here's a good thing going for the top people in the department. The people that got this thing going were Zarate, then Alcantara and Workama. But then the people that did the final acts in 2010 were their friends, Spitzer, Spizer, and a guy named Rose and Avila, who were people at the same rank there. And I know our position is there's a saying in the department, not well-known, that there are two types of policemen, those that are there for the department and those that work for the people. They see, we were working for the people. The people of the higher echelon were keeping a good thing going. And one thing I wanted to point out is that there's a pattern of this in police departments around the country. Judge Noonan and his panel of the Ninth Circuit took judicial notice of the Christopher Commission Report because, and one whole chapter there was on the code of silence, where you're not supposed to say something negative about one of your officers. The problem Mr. Hernandez had was that he had taken a real whistleblower and directed her to Workama. He never even went to Workama to get this thing started. Workama comes in and uses the F word saying, what the fuck do you have against my friend Zarate? Now that is basically criticizing him for talking to someone when all he really said was, go to Workama, he's in the chain of command, he's the right guy. Later, there's another direct order not to talk to anyone. And this is very close in time to all these adverse actions. In January, 2010, Alcantar told him, do not talk to anyone under any circumstances about Zarate, indicating to me that he had heard some recent rumors because the indictment of Zarate for his time card fraud was over and done with. It started in 2008 and 2009. As we're all aware, there was a big financial crisis in this country, still going on in 2010, and the city of San Jose had a lot of pressure to be economical, not have waste and everything. They wanted to not have allegations floating around of waste and mismanagement. And the newspaper articles that are in the record that are attached to my declaration, talk about an audit in 2012, criticizing the department for the same sort of things that were happening in 2007. So it's a black eye on the department. So we're saying it doesn't have to be Alcantar. It's the establishment at the top that wanted no criticism. So you had to show that there was a factual, a genuine factual dispute. Yes, Your Honor. And one of the three ways... Where on these hiring decisions that were made in, I guess, 20, 20... 2010. 2010. July, August, and, and there's other things happening in November. Tell me where, how they're describing the factual dispute that the district court overlooked. Well, Your Honor, the way of proving that there's a motivating factor relating is threefold, according to the city. The city decided a 2012 case, but Judge Wardlaw issued the Ellen's decision in 2013, saying there's three ways to do it. One is you can show they expressed opposition to the speech. Well, I'm sorry. The speech was proximate in time. That's one way. A whole... That's a hard, you got a tough road on that. I got a tough road on that. Okay. Another one is the employer expressed opposition to the speech, either to the speaker or to others. Here we have the employer, two levels above my guy, Hernandez saying, don't talk about Zerati to anyone. And the evidence here about when the speech is going, there's no evidence about that the speech stopped in 2007. It says it started there, but there's no evidence in the record saying it stopped. He was talking to everyone he could. And according to Cindy Calderon, she was too. She listed 20 people she spoke to. Well, I guess, I mean, I guess you could draw an inference from that statement that, that he would, that what's-his-name wouldn't have made that, wouldn't have called him in had there not been something going on. Yes. That's what we're asking. So you'd look at the evidence in light most favorable to your client. Why would he come in through your name? You would draw that inference in his favor. Yeah. He's about to retire. Alcantara is about to retire. He says, I have friends in the department. I can make things difficult to you. I do not want you to talk about this to anybody. All right. So what's the third? What's the third? And that's your key one. The third way is the proffered explanation for the adverse action for false and pretextual. And there, we think that's- So what's the dispute? Where's the factual? What's the dispute? What is the competing evidence? The competing evidence, they say, oh, they flunked the oral exams. And our competing evidence is these oral exams were completely subjective. And they're blindsiding people with exam questions on the gang intelligence test. Isn't there something about the exam being administered on a day when one of them was supposed to be on vacation, and then they changed the date? Yes. They were almost manipulating the situation so that he wouldn't even be able to take the exam. Right. There was circumstantial evidence on the two exams that Lou took that they were trying to arrange things so he wouldn't even be able to take it. The second exam was held on a day when he had told them I can't show up. As it turned out, he was able to show up, so he was able to take it. But they also put him first. And according to him, in his declaration, going first is a big disadvantage because then they can set your bar. And if they don't want you, they just make everybody grade higher. It's like in the Olympics. It's not good to go first. You want to be last so you can see how good everybody else did. And the judges are afraid of scoring someone's too high because they want to give range for someone to do better. So the order of examinations is very important. And according to him, in his 20 years on this department. I thought there was some evidence in the record that there was a general, sort of a general sense that the exams were just really not legit. There is that in both Cindy's declaration and Lou Hernandez's declaration. And so let me suggest, Your Honor, that I reserve 40 seconds for rebuttal. Okay. Thank you. Thank you. Good morning, Your Honor. My name is Katie Zoglin. I represent appellees and defendants, City of San Jose, San Jose Police Department, Ernie Alcantara, and James Workamo. The city asks that this court affirm the trial court's grant of summary judgment. As the trial court observed, plaintiffs provided only a string of conclusory and speculative assertions or hearsay made without foundation. As an initial matter, I respectfully disagree with my counsel's recitation of many of the facts. Many of the issues that he highlighted are just plainly not in the record. For example, evidence about the lax time card records and so on that he talked about. There are newspapers records, but he, even in Mr. Hernandez's declaration, he says he's not submitting them for the truth of the matter, and those are clearly hearsays, as I'm sure the court is aware. But there was some evidence surrounding the tests and their relevant experience and sort of the manipulation of the test date and the order of testing. Why doesn't that evidence raise a genuine issue of material fact? It does on several levels. So, for example, there needs to be a causal connection between his protected speech and the adverse employment reaction. There's no evidence in this case. There's evidence from which you could draw an inference of a causal connection under the cat's paw theory. Well, I don't think you can in that fact. So the two cases that are on that are like Staub, in which there's some kind of animus shown by the decision maker. There's no evidence that Spicer, who was the lieutenant in charge of the gang unit, had any knowledge of any speech that Mr. Hernandez participated in or that Ms. Calderon was friends with Mr. Hernandez. There, as Hernandez acknowledges, that he has no evidence that any of these people spoke to anyone, Alcantar or Workman, spoke to Spicer. He was buddies with Zarate, right? He showed up at Zarate's – there's evidence in the record that he was present when they had a little going-away party for Zarate when he retired, and he spoke highly of Zarate at that time. I don't think there's any admissible evidence of that, Your Honor, because I think if Mr. Hernandez stated that, he was not present. So once again, this case is based on a lot of hearsay and allegations that lack foundation. Roberts, was there a going-away party for Zarate? I do not know one way or the other, Your Honor. There's no admissible evidence before that. Was Spicer's deposition taken? Yes. And the only part of Mr. Spicer's deposition that is in the record is that he places the order of interviews for the units based on seniority. But nobody asked him at that deposition whether or not he had any conversations with Zarate? There's nothing in the evidence before this Court on that. No, and that wasn't my question. Was there anything in the deposition where they asked Zarate if he had any – asked Spicer whether he had any conversations with Zarate? Your Honor, I don't know one way or the other. I was not the attorney at the trial court level, and I did not review all of that because it wasn't before this Court. So in the summary judgment proceeding, not – the entire deposition was not placed in the district court record? Correct. Only excerpts of the deposition. Right. And only two pages from Spicer's declaration, which – Deposition. Deposition, which was put forth by the city. So let me ask you this. Why would – is there any dispute over Alcantar confronting Hernandez in, I guess it was January of 2010, stop talking about Zarate? Not – there's no dispute just as to that. There's dispute as to what else he might have said. Why – right. Why would Alcantar do that if there wasn't some ongoing conversation about Zarate? So – because people gossiping in the workplace is a distraction from working people. Well, listen. Let me ask you this. Was Zarate indicted or was there a criminal charge filed against him? Once again, it's not in the records. My understanding, they were initially filed, but it was –  That's something we can – could we take – let me ask you. Could the district court take judicial notice of the fact that a criminal complaint was filed against Zarate? Yes, and that it was dismissed. Right. Fine. But I just – the fact that he was – a complaint was filed, right? Yes. There must have been something going on in the department about time card fraud related to Zarate, right? I agree. Right? Yes. And it looks like you can draw a reasonable inference from Alcantar confronting Hernandez in January 10 that there was still ongoing discussion or concern or, you know, a level of – a topic that was upsetting people in the department. You call it gossip. Yes. Alcantar – Nonetheless, something was going on at least up until January of 2010. That is correct. Alcantar retired in June. He retired before any of these people submitted – before Calderon or Hernandez submitted their applications for the gang unit. There's no evidence. I think – one of the problems with how this was addressed is that just because they can't sue for the – any adverse employment actions that took place in the case, the actions and the dealings with Alcantar and Zarate were those – that evidence wouldn't come in to support a claim of retaliatory conduct afterwards. I mean, it's all part of one big picture, even though you couldn't sue for an actual injury prior to the time that – you know, two years before the complaint was filed. I would agree that Alcantar's statement would be – is relevant or a court can consider that. I don't think that the – what happened in 2007 with Workoma can – the cases that usually allow you to look at the context usually do so – you know, those are more in sexual harassment cases. But even in those cases, it can't be – they have to be continuing and ongoing. It can't be sporadic and isolated. But this is still evidence that this is what Workoma said, and it's – so it's still an admission of a party here. And it's – just because you can't sue for any wrongful action doesn't mean that statement couldn't come in to promotive. As to Alcantar, yes, I think for Workoma, it doesn't work that way, because Workoma initiated the conversation saying, you know, what's going on with you all. And then when Officer Hernandez talks to him about his complaints about Zerati, Workoma – the evidence is clear that Workoma makes no reaction to that. It seems to me what we're talking about is disputed facts. So, I mean, it seems to me that there are – I mean, the only thing I'm suggesting is that we're just – we're arguing the facts in this case. And that always tells me that summary judgment shouldn't have been granted, because you're supposed to view the facts and the like in most favor of the nonmoving – in the favor of the nonmoving party, and they seem to advance some genuine disputes of fact, and now you're arguing those facts with me. So it seems like there's something to be decided. I respectfully disagree. As to me, there are not disputes of fact. First of all, Hernandez testified he had no complaints about mistreatment of Workoma after he left the airport assignment. He acknowledged that he has no evidence that Workoma spoke to Spicer about his gang application. He acknowledges he doesn't know one way or the other if Workoma ever spoke to anybody about what Hernandez reported to him. And Workoma did not express any opposition to what Hernandez reported to him. There's no evidence that Workoma ever spoke to any of the decision-makers for either of the applications, either of them made to either of the specialized units. You know, there's no indication – there's no evidence in the record that the fact that they did not get on the gang unit, that it's a pretextual one. The evidence that they present is not admissible evidence, and this Court is only allowed to look at admissible evidence when determining whether – That's not entirely – that's not entirely correct. How so, Your Honor? We're looking at summary judgment. You're not really – you're not technically bound by the rules of evidence completely. There is a little more leeway at the summary judgment stage than when you're at trial. Well, under the Federal Rules of Civil Procedure, you know, Section 56C indicate that summary judgment can only be supported by admissible evidence. Yes, but there is a little more flexibility at summary judgment. I understand. I understand what you're saying. I think the reason – because we're supposed to view the facts in the light most favorable to the nonmoving party, so it's – yes, it can only be admissible evidence, but we look at that admissible evidence and we look at it in the nonmoving party's favor. Of course. And there's no, you know, credibility is out the door. You don't consider credibility or anything. Of course. You just look – you look to see what the evidence is, the competing evidence, and you ask, you know, is there a material fact there that could be outcome-determinative? I agree, yes. And if there is, then the district court has no business granting summary judgment. I agree. However, there's no evidence whatsoever that any of Hernandez's speech played any role. There's no causal connection that his – any of his protected speech played a role in any of the decisions. Well, one could say, you know, you look at – you look at what Alcantar said in January of 2010, which I think he's – Hernandez would be entitled to a reasonable inference that there was still concern about time card fraud in the department. Right? That's not an unreasonable inference under the circumstances. That conversation, as I understand it, was witnessed by Sergeant Elvendar? Yes. Did he testify to it as well? He – he has a declaration in. And did he agree to say that – did he agree that conversation occurred? Yes. Yes. Yes. But once again, I'll go back to – so Alcantar retired. There's no evidence he told anybody any of this. Now, what was Alcantar's rank in the department? He was a captain. He was a mucky-muck. He was one of the higher-ups. Right. So, yeah. I only have limited time left. May I address a few other points? I also want to – there's several of the – the things like the sick time. I don't think that rises to the level of an adverse job action. That was ultimately – Hernandez said he had a new boss, and the boss said, you have to take sick time. He said, no, I don't. And it turned out he had, you know, workers' comp leave for it. So he didn't need to take any time. I don't think that rises to the level of any kind of adverse job action. With respect to Ms. Calderon, she was accepted into the family violence unit. So – Later, though, right? Yes. Six months later. But there – you get no additional pay for being on. So there's no lost wages associated with that. It's just it was delayed. She turned it down. There was something about her uniform, something that they did. Yes. And that's another issue that does not rise to the level of any kind of adverse action. This was – Lieutenant McGrady saw her. She was supposed to wear her battle dress uniform, her BDU. She didn't. He said, you can either get another assignment or you can go home. She decided not to just have another assignment for that day. She decided to go home. It's unclear whether or not she even had one that she could fit into because she had to go buy a new one. But she went home. She didn't go home and bring it and come back to work that day. She just stayed home the rest of the day. Once again, that – Let me ask you this. Is there any evidence in the record that if you participate in one of these units, like a gang unit or this domestic violence unit, that that's a favorable item that, you know, on your resume within the department so that you can move into higher up positions? I think working specialized units, they put in testimony that it is considered a favorable item. Sure. Right. Yes. And for Ms. Calderon, under Strahan v. Kirkland, she fails to make the nexus between – first of all, she provides – her claim is that she suffered as a result of her association with Hernandez. Her support of Hernandez. Right. And, however, there's no evidence in the record, once again, that any decision maker, anybody knew that they were friends or that any of the action was based on her association with him. Her – it's just based only on her speculation that she could not think of any other reason why it would be – that would be the case. And if the Court doesn't have any other questions, I will – well, my time's up anyway. All right. So, thank you very much. Thank you very much, Counsel. Thank you, Your Honor. I have very little time, so I have two sites I'd like to bring to your attention. The Declaration of Met-Elvander is at pages 204 and 210. And he puts a lie to their statement that these oral exams that Spicer set up were objective in any way. He asked Lieutenant Spicer, because he was so surprised that these excellent officers were not getting in, and Lieutenant Spicer told me that there's not anything either one of them could do to get into his unit. It's at pages 204 and 205. Now, the S.E.R. 907 is a testimony in the record put in there by the City, without objection, where Lou Hernandez testified, I was at the party, where Spicer is telling how great the captain is as he's retiring. It's at S.E.R. 97. The last ten seconds, Your Honor, I'd like to bring your attention to two cases to show how indirect the evidence of retaliation can be. One is Judge Noonan's decision in Blair v. City of Pomona at 223 F. 3rd, 1007. And the other one is Atticus v. S.H. Crescent Company, something I referred to in my oral argument, but I gave no citation, is at 398 U.S. 144 in 1970. In neither one of those was there direct evidence of a conversation by somebody that had been complained to. It was all circumstantial. Bad things happened after the conduct in question. So I thank you very much for your time. All right, thank you, Counsel. Hernandez and Calderon v. San Jose is submitted, and we'll take up our last case on the docket, Palmer v. Colvin.
judges: Noonan, Wardlaw, Paez